NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO T.T.

No. 1 CA-JV 26-0052
FILED 8-12-2026

---

Appeal from the Superior Court in Maricopa County
No. JD41285
The Honorable Joan M. Sinclair, Judge

**AFFIRMED**

---

COUNSEL

Robert D. Rosanelli, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Veronica F. Rios
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Angela K. Paton delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Judge Michael J. Brown joined.

---

**P A T O N**, Judge:

**¶1** Elaine T. ("Mother") appeals the juvenile court's order terminating her parental rights to T.T. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2** We view the facts in the light most favorable to upholding the juvenile court's termination order. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250, ¶ 20 (2000).

**¶3** Mother's daughter, T.T., was born in September 2021. The day after T.T. was born, the Department of Child Safety ("DCS") received a hotline report from the hospital concerning Mother's ability to parent. Mother reportedly presented with a cognitive disability, causing her to struggle to hold T.T. correctly and answer simple questions, such as what her phone number was.

**¶4** DCS took temporary custody of T.T. upon her discharge from the hospital, then petitioned to adjudicate her dependent. The juvenile court found T.T. dependent as to Mother in April 2022.

**¶5** DCS referred Mother to parenting classes and supervised visitation. At DCS's direction, Mother self-referred for counseling. Mother also received a psychological evaluation and was diagnosed with "Intellectual Disability (Intellectual Developmental Disorder), Moderate."

**¶6** Mother regularly participated in services until March 2023, when she moved to Illinois with her aunt and uncle. After Mother moved to Illinois, DCS provided only virtual visitation and case management services. Mother obtained counseling in Illinois through self-referral.

**¶7** In June 2023, DCS moved to terminate Mother's parental rights and those of T.T.'s unknown father, alleging mental deficiency and fifteen months' out-of-home placement grounds as to Mother and abandonment as to the unknown father. In December 2023, the juvenile court terminated the unknown father's parental rights but denied termination as to Mother, finding DCS had not made diligent efforts to provide reasonable reunification services since Mother moved to Illinois.

**¶8** Mother returned to Arizona in March 2024. DCS provided her with parenting classes, therapy, and supervised visitation. DCS also assisted her with obtaining food, transportation, and disability resources.

**¶9** Mother participated in all services recommended by DCS, and DCS reported that she was "teachable and able to be redirected." But

due to her cognitive limitations, she made minimal progress in acquiring the necessary skills to parent T.T. without prompting and assistance. Mother's Nurturing Parenting Program ("NPP") provider reported that Mother struggled to retain and apply the information she learned in class despite the provider's attempts to repeat and rephrase information, break down lessons into smaller parts, and to use a kindergarten-level book to assist Mother's comprehension. Mother's NPP referral was eventually closed out in August 2024 because her provider believed Mother's cognitive impairment was so severe that she needed more in-depth support, such as services through the Department of Developmental Disabilities ("DDD").

¶10 Mother also struggled to focus and adequately supervise T.T. during visits. She allowed T.T. to throw rocks down a slide without stopping her until prompted by a case aide, to get her finger stuck in a vending machine while Mother was distracted looking at clothes, and to chew on a glowstick Mother handed her from the floor. Mother also refused to give T.T. water when asked.

¶11 Mother did not comprehend how her cognitive impairments limited her as a parent. She told DCS that she did not understand why her child was taken from her in the first place. Mother also overestimated her parenting abilities, stating that she has "very good" skills as to parenting attachment, empathy, nurturing oneself, gentle touch, discipline, and expectations of children. Mother's NPP provider found otherwise, noting that Mother especially struggled to understand the parent-child dynamic and feel empathy for others.

¶12 In May 2025, Mother received a neuropsychological evaluation by Dr. Kelly Rodriguez, who interviewed Mother, conducted psychological and neuropsychological testing, and reviewed documents from DCS and its service providers. Dr. Rodriguez concluded that, due to her intellectual disability, Mother was unlikely to be able to safely parent without ongoing support. Dr. Rodriguez also recommended Mother be referred to DDD services to obtain ongoing support.

¶13 Mother did not have stable housing at the time of the neuropsychological evaluation, and Dr. Rodriguez was concerned that she was at risk for "continued housing instability." Mother also required services from DCS above and beyond those that DCS usually provides and called DCS frequently for help with daily tasks, including finding food or furniture. DCS assisted Mother in submitting several applications for DDD services throughout the dependency. After being rejected several times, Mother was finally approved for DDD services around January 2026.

¶14 In December 2025, DCS again moved to terminate Mother's parental rights on mental deficiency and fifteen months' out-of-home placement grounds. The juvenile court held a termination trial in March 2026 and heard testimony from Dr. Rodriguez and Mother's DCS case manager, Tamika Lennear. Dr. Rodriguez testified that Mother had "pretty significant impairment in terms of her cognitive abilities," and that "in general, a person's intellectual cognitive abilities are stable." Dr. Rodriguez therefore explained Mother "may be able to improve some of her deficiencies or impairments" but likely would not make "a big improvement." Dr. Rodriguez opined that Mother "would likely need ongoing supports and resources in order to parent."

¶15 Dr. Rodriguez was particularly concerned about Mother's impaired "cognitive flexibility," which "impacts her ability to learn and maintain new information and skills." She testified that there were "a lot of skills and parenting knowledge that [Mother was] going to have to learn in terms of being able to identify certain safety risks," which Mother was likely "going to have difficulty in." Dr. Rodriguez also testified that Mother will likely struggle with maintaining schedules and communicating with doctors and school officials. She further noted that Mother had impaired fine motor skills, which "can negatively impact a person's daily tasks, such as dressing yourself, dressing your child, grooming[,] and things like that."

¶16 Dr. Rodriguez testified that she learned Mother was now approved for DDD services. But she did not know whether DDD services would be "helpful in terms of parenting" and "believe[d] it focuses more on the individual person's functioning." Ultimately, Dr. Rodriguez concluded that due to the severity of Mother's cognitive impairments, Mother was unlikely to make "big improvement[s]" in her parenting skills.

¶17 Mother's case manager, Tamika Lennear, testified similarly regarding Mother's lack of progress in improving her ability to parent despite receiving services over a significant period of time. She discussed DCS's concerns that Mother "may not be able to understand and appropriately respond or even plan for, or even have the capacity to understand preventative measures for [T.T.]'s milestones and growing up going forward." She testified that Mother heavily relied on DCS to "navigate housing, transportation, [and] resources such as food." Lennear noted that the assistance she provided to Mother in that respect—obtaining food for her and T.T., housing, and furniture—was more than she would typically provide. She also expressed concerns about Mother's ability to "make appropriate decisions [and] use sound judgment," because Mother was temporarily homeless when she left the transitional home where she

lived in order to stay with her fiancé. She believed that lack of sound judgment would continue to negatively impact Mother's ability to safely parent T.T. But she also testified Mother and her fiancé found housing after about a month of homelessness and had lived there for four or five months by the time of trial, which DCS considered to be "consistent housing."

¶18 Lennear also testified that visitation was taking place at Mother's home, which was "safe and appropriate." She reported that "the visits go well and [t]here were no major concerns." But she also noted an incident where Mother gave T.T. a cup of hot water to wash paintbrushes which T.T. accidentally knocked over, causing her to burn herself. Lennear noted that although Mother became engaged during visits, she previously got distracted by other parents when visits were happening at a visitation center and would ignore T.T.'s "mama" prompts. Mother also displayed affection towards T.T., which T.T. reciprocated, and the two of them shared a strong bond. Lennear confirmed that in two recent visits, Mother showed understanding of T.T.'s likes or dislikes and recognized when T.T. needed to be cleaned or fed.

¶19 Lennear testified that Mother was receptive and had made "her best efforts" in reunification services, but she did not believe Mother would be able to parent independently "anytime in the foreseeable future." Lennear explained that Mother lives with her fiancé, but DCS did not deem him a responsible parent to help Mother effectively parent T.T. because he has boundary issues, struggled to set up consistent housing, and has multiple undocumented psychological disorders for which he self-medicates with marijuana; he reportedly told DCS he would choose smoking marijuana over taking care of T.T.

¶20 Although Mother was approved for DDD services shortly before trial, Lennear testified "it [was DCS's] view that the DDD services are to help [Mother] and wouldn't necessarily affect the areas that [DCS was] concerned about, her being able to safely parent [T.T.]." But Lennear acknowledged that depending on what services DDD provides, it could possibly provide Mother with the means to safely parent T.T.

¶21 The juvenile court found grounds for termination based on Mother's mental deficiency and fifteen months' out-of-home placement proven by clear and convincing evidence. As to the mental deficiency ground, the court found Dr. Rodriguez's conclusion that "Mother [could] not independently parent, and she would need ongoing support and resources to do so" was "unrebutted." As to the fifteen months' out-of-home placement grounds, the court found that "DDD services will help

Mother individually but will not be able to help her parent independently" because "[t]hat [wa]s not what those services [were] designed for." The court noted Mother could only retain new information for one to two days so "essentially no real progress was being made[,]" which impacts her ability to exercise sound judgment and make good decisions while parenting T.T. It further found "Mother's cognitive abilities . . . have not changed over this entire case" and Mother could not reunify with T.T. "due to her inability to comprehend and make good decisions for [T.T.]."

¶22        The court then found termination was in T.T.'s best interests because her foster placement, which she had been with since birth, was willing to adopt her, and "it would be unfair for [T.T.] to wait any longer."

¶23        Mother timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") Sections 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶24        Mother argues the juvenile court erred in finding statutory grounds for termination existed. She contends substantial evidence does not support the finding that she is either unable to parent now or in the future. Accordingly, Mother argues the juvenile court erred in finding she was unable to parent due to her mental deficiency and reasonable grounds existed to believe the condition would continue for a prolonged indeterminate period. Mother argues the court likewise erred in finding she has failed to remedy the circumstances that caused T.T.'s out-of-home placement and that there was a substantial likelihood that she would not be capable of exercising proper and effective parental care and control in the near future.

¶25        "[W]e will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

¶26        To terminate the parent-child relationship, the juvenile court must find (1) by clear and convincing evidence that at least one statutory ground for termination exists, and (2) by a preponderance of the evidence that the termination is in the child's best interests. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149-50, ¶ 8 (2018); *see also* A.R.S. § 8-533(B) (listing grounds for termination). As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec.*

*v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). We will therefore affirm the juvenile court's factual findings if supported by reasonable evidence. *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 93-94, ¶ 4 (App. 2009).

**¶27** To terminate parental rights due to mental deficiency, the juvenile court must find "[t]hat the parent is unable to discharge parental responsibilities because of . . . mental deficiency . . . and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3). The term "parental responsibility" refers "to those duties or obligations which a parent has with regard to [her] child." *In re Maricopa Cnty., Juv. Action No. JS-5894*, 145 Ariz. 405, 408-09 (App. 1985). "The term is not intended to encompass any exclusive set of factors but rather to establish a standard which permits a trial judge flexibility in considering the unique circumstances of each termination case . . . ." *Id.* at 409.

**¶28** To terminate Mother's parental rights due to her mental deficiency, DCS was required prove that Mother is both presently unable to parent due to her mental deficiency and that her mental deficiency is likely to continue for a prolonged indeterminate period. *See* A.R.S. § 8-533(B)(3).

**¶29** Mother contends that substantial evidence does not support the juvenile court's findings that she is currently unable to parent due to her mental deficiency. She points to visitation notes from the two months before trial documenting instances of her caring for and protecting T.T., therapy notes indicating she presented "within normal limits" in all areas, including appearance, behavior, perception, and judgment, and the fact that she has sufficient finances and stable housing. But "the resolution of conflicting evidence is 'uniquely the province of the juvenile court,' . . . even when 'sharply disputed' facts exist." *Alma S.*, 245 Ariz. at 151, ¶ 18 (citations omitted). The juvenile court could reasonably rely on Dr. Rodriguez's testimony that Mother's cognitive impairments rendered her incapable of parenting T.T.

**¶30** Other evidence in the record also supports the court's finding that Mother is presently unable to parent T.T., including Mother's extensive reliance on DCS for daily activities such as obtaining food and furniture and her struggle to maintain consistent housing. *See Vanessa H. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 252, 257, ¶ 22 (App. 2007) (noting the juvenile court's ability to resolve conflicting evidence). The court could reasonably conclude that Mother's inconsistent ability to take care of her own basic needs translates to an inability to adequately and safely care for T.T.

**¶31**      Throughout nearly five years of services with DCS, Mother continually struggled to care for herself and recognize threats against her or T.T.  She relied on others to do basic tasks such as obtaining food and furniture and could not connect resources provided by DCS to her life or articulate how those resources would help her parent T.T.  Mother also needed extensive accommodations from service providers, including breaking down lessons into smaller lessons and teaching her at a kindergarten level, but even then, Mother could not retain information beyond one or two days.  So even if Mother receives additional resources and services, there is evidence in the record that those services would not meaningfully improve her ability to parent T.T.

**¶32**      Mother also displayed poor judgment that endangered T.T. during visits.  *Supra*, ¶ 10.  Although Mother has made some progress in recent visits, both Lennear and Dr. Rodriguez testified that Mother's poor judgment was unlikely to improve.  It was not error for the court to credit that testimony in finding that Mother's mental deficiency was likely to continue to negatively impact her ability to effectively care for T.T.

**¶33**      Mother focuses on the case notes from her two most recent visits with T.T., in which the parenting supervisor found no safety concerns to argue that she "has demonstrated that she can effectively parent [T.T.]." But Mother's recent improvement during two isolated visits does not extinguish the evidence of her significant history of inability to perform basic life functions—such as obtaining consistent food and housing—due to her cognitive impairment.  *See Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 29 (App. 2010).  And we will not reweigh the evidence on appeal.  *Alma S.*, 245 Ariz. at 151, ¶ 18.

**¶34**      The record also supports the juvenile court's finding that Mother's mental deficiency will persist "for a prolonged indeterminate period."  A.R.S. § 8-533(B)(3).  Mother broadly states that she needs, and has now accessed, additional "support" and "resources" that provide her with the ability to parent.  But the court heard testimony from Dr. Rodriguez that due to the severity and stability of Mother's cognitive impairments, Mother was unlikely to make "big improvement[s]" in her parenting skills. Further, DCS was not required to prove that there are reasonable grounds to believe Mother's mental deficiency would continue to negatively impact her ability to parent in the same way it does currently, only that the mental deficiency itself would persist for a prolonged indeterminate period.  A.R.S. § 8-533(B)(3); *see also Raymond F.*, 224 Ariz. at 379, ¶ 25 ("To support termination under § 8-533(B)(3) [DCS] must also prove there are reasonable grounds to believe that the *condition* causing an inability to parent will

continue for a prolonged and indeterminate period.") (emphasis added). And even if DCS was required to prove that Mother's mental deficiency would continue to negatively affect her ability to parent, there is reasonable evidence in the record that Mother's cognitive impairment will continue to impact her ability to parent T.T. *Supra* ¶¶ 10, 31-32.

¶35 While Mother's recent efforts to improve and be present for T.T. are commendable, and the record shows the two share a bond, T.T.'s well-being is paramount. And ultimately, there is reasonable evidence to support the juvenile court's finding that Mother is unable to discharge her parental responsibilities due to her mental deficiency and that her mental deficiency will persist for a prolonged indeterminate period. *See Denise R.*, 221 Ariz. at 93-94, ¶ 4. The juvenile court thus did not err in finding statutory grounds for termination existed due to Mother's mental deficiency.

¶36 Because DCS must prove only one ground for us to affirm the termination of parental rights, we do not address the court's finding as to the fifteen months' out-of-home placement ground. A.R.S. § 8-533(B); *Raymond F.*, 224 Ariz. at 376-77, ¶ 14. And Mother does not contest the juvenile court's best interests finding, so we do not address it either.

## CONCLUSION

¶37 We affirm.

